BELLEMEAD DEVELOPMENT
CORP., Plaintiff,

v.

NEW JERSEY STATE COUNCIL OF CARPENTERS BENEFIT FUNDS and Carpenters Local Union No. 455, New Jersey State Council of Carpenters Benefit Funds and Carpenters Local Union No. 620, Defendants.

NEW JERSEY STATE COUNCIL OF CARPENTERS BENEFIT FUNDS and Carpenters Local Union No. 455, New Jersey State Council of Carpenters Benefit Funds and Carpenters Local Union No. 620, Counterclaimant, Third Party Plaintiff,

v.

BELLEMEAD DEVELOPMENT CORP., Counterdefendant and Violet Construction, Architectural Millwork, Inc., a.k.a. Architectural Millwork of Emerson, Third Party Defendants.

No. CIV. A. 97–4469 (ALJ).

United States District Court,
D. New Jersey.

May 13, 1998.

Walter H. Fleischer, Jr., Shanley & Fisher, P.C., Morristown, NJ, for Plaintiff and Third Party Defendant Bellemead Development Corp.

James R. Zazzali, Zazzali, Zazzali, Fagella & Nowak, Newark, NJ, for Defendants, Counterclaimants, and Third Party Plaintiffs New Jersey State Council of Carpenters Benefit Funds and Carpenters Local Union No. 455 and Carpenters Union No. 620.

## OPINION

LECHNER, District Judge.

This is an action by plaintiff Bellemead Development Corp. ("Bellemead") against defendants New Jersey State Council of Carpenters Benefits Funds (the "Funds"), Carpenters Local Union No. 455 ("Carpenters 455") and Carpenters Local Union No. 620 ("Carpenters 620").[1] The complaint (the "Complaint") seeks a declaration that the construction lien claims filed by the Defendants for fringe benefit contributions are preempted by ERISA. *See* Complaint at Count One, p. 6 and Count Two, p. 8. The Complaint also requests the Defendants be enjoined from filing such claims against Bellemead in the future, a discharge and release of all construction liens filed by the Defendants for fringe benefit contributions, compensatory and punitive damages, attorneys' fees and costs of suit and such other relief deemed just and equitable. *See* Complaint at Count One, p. 6 and Count Two, pp. 8–9.

Jurisdiction is alleged pursuant to 28 U.S.C. § 1331. *See* Complaint at ¶ 5.

Presently pending are the motion of Bellemead for summary judgment (the "Bellemead Motion for Summary Judgment") and a cross motion for summary judgment by the Defendants (the "Cross Motion for Summary Judgment").[2] For the reasons set forth below, the Bellemead Motion for Summary Judgment is denied. The Cross-Motion for Summary Judgment is granted.

*Facts*

*A. Parties*

Bellemead is a New Jersey corporation with its principal place of business in Roseland, New Jersey. *See* Counterclaim and Third Party Complaint at ¶ 40. Bellemead is an owner and developer of various parcels of

---

1. Carpenters 455 and Carpenters 620 will be collectively termed the "Unions." Additionally, the Funds and the Unions collectively will be termed the "Defendants."

2. In support of the Bellemead Motion for Summary Judgment, Bellemead submitted: Plaintiff's Statement of Material Facts as to Which It Contends There Is No Genuine Issue to be Tried (the "Bellemead 12G Statement"); Plaintiff's Brief in Support of Motion for Summary Judgment (the "Bellemead Moving Brief"); Certification of Joanne Meisler (the "Meisler Cert."), with attached Exhibits A–D; Plaintiff's Reply Brief in Support of Motion for Summary Judgment and in Opposition to Defendants' Cross Motion for Summary Judgment or, in the Alternative, Motion to Dismiss (the "Bellemead Reply"); Reply Certification of Walter J. Fleischer, Jr. (the "Fleischer Cert."), with attached Exhibit A.

In opposition to the Bellemead Motion for Summary Judgment and in support of the Cross Motion for Summary Judgment, the Defendants submitted: Defendants' Response to Plaintiff's Statement of Fact to Which There Are Allegedly No Disputed Material Facts (the "Defendants' 12G Statement"); Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment and Cross Motion for Summary Judgment or, in the Alternative, Motion to Dismiss (the "Defendants' Brief"); Affidavit of Aileen M. O'Driscoll (the "O'Driscoll Aff.") with attached Exhibit A; Affidavit of George R. Laufenberg (the "Laufenberg Aff.") with attached Exhibits A–D; Reply (the "Defendants' Reply").

The Defendants' Motion for Summary Judgment, although termed a "Cross Motion for Summary Judgment or, in the Alternative, [A] Motion to Dismiss" will be treated like a motion for summary judgment because it relies upon supporting materials, such as the O'Driscoll and Laufenberg Affidavits, outside of the Complaint. The Defendants' Motion for Summary Judgment requests enforcement of their lien rights or dismissal of the Complaint in its entirety. *See* Defendants' Brief at 28.

real estate located throughout New Jersey. *See* Bellemead 12G Statement at ¶ 1; Defendants' 12G Statement at ¶ 1.

The Funds are operated under and regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq. See* Counterclaim and Third Party Complaint at ¶ 38. The Funds are jointly administered by labor and management trustees on behalf of its beneficiaries—the members of the Unions. *See* Laufenberg Aff. at ¶ 3. The Funds provide medical, hospitalization, dental, pension, annuity and other benefits to carpenters who are members of the Unions and their families. *See id.* at ¶ 4. The Funds depend upon the receipt of fringe benefit contributions due and owing for carpenters covered by applicable collective bargaining agreements and investment income generated from such contributions to meet their obligations. *See id.* at ¶ 6; Counterclaim and Third Party Complaint at ¶ 38.

The Unions are labor organizations as defined by 29 U.S.C. § 152. *See* Counterclaim and Third Party Complaint at ¶ 39.

Violet Construction, Inc. ("Violet") and Architectural Millwork of Emerson, a/k/a Architectural Millwork Inc. ("Architectural") (collective the "Subcontractors") performed work on two separate construction projects located on property owned and/or managed by Bellemead.[3] *See* Opposition at 3. Violet was a subcontractor on a Bellemead project located at 20 Waterview Plaza, Parsippany, New Jersey (the "Waterview Project"). *See* O'Driscoll Aff. at ¶ 6. Architectural was a subcontractor on a Bellemead project located at 30 Independence Drive, Warren, New Jersey (the "Independence Project").[4] *See* Counterclaim and Third Party Complaint at ¶ 55; Laufenberg Aff. at ¶ 10; Meisler Aff. at ¶ 6; Exh. C to Meisler Aff. Both Violet and Architectural are New Jersey corporations with principal places of business in New Jersey. *See* Counterclaim and Third Party Complaint at ¶¶ 41–42.

## B. *Procedural History*

■ Bellemead filed the Complaint against the Defendants on 15 September 1997 seeking a declaration that the construction lien claims filed by the Defendants were preempted by ERISA and a discharge of such lien claims. *See* Complaint at Count One, p. 6 and Count Two, pp. 8–9. The Complaint also requested that the Defendants be enjoined from filing future construction lien claims.[5] *See id.*

---

**3.** On or about 19 November 1997, Architectural satisfied its delinquency with the Defendants. *See* Opposition at 3 n. 2. On 26 November 1997, Architectural was dismissed as a third party defendant. *See* Notice of Dismissal; O'Driscoll Aff. at ¶ 20. The remaining issue in the instant matter involves the claim filed by the Defendants for work performed by Violet on behalf of Bellemead.

**4.** The Independence Project has also been identified by its location at 30 Independence Boulevard, *see* Laufenberg Aff. at ¶ 10, and 30 Independence Way. *See* Complaint at ¶ 12. Resolution of the correct address of the Independence Project is unnecessary.

**5.** Paragraphs sixteen and twenty-three of the Complaint refer to the Construction Workers' Fringe Benefit Security Act (the "Fringe Benefit Act"), N.J.S.A. 34:11A–1 to –12. *See* Complaint at ¶¶ 16, 23. Bellemead concedes the liens filed by the Defendants were filed under the Construction Lien Law (the "Construction Lien Law"), N.J.S.A. 2A:44A–1 *et seq.*, and not the Fringe Benefit Act. *See* Reply at 1 n. 1. Bellemead contends such a distinction does not affect the instant analysis because both the Construction Lien Law and the Fringe Benefit Act are preempted by ERISA. *See id.* 'Bellemead indicates that even before the Opposition was served, the Defendants were informed it was the position of Bellemead that ERISA preempted the claims of the Defendants under both the Fringe Benefit Act and the Construction Lien Law. *See id.;* 31 October 1997 Letter sent by Walter J. Fleischer, Jr. attached as Exh. A to Bellemead Reply.

The Defendants argue the reliance of Bellemead upon the Fringe Benefit Act instead of the Construction Lien Law, the applicable state statute, is a deficiency in the Complaint requiring the granting of summary judgment in favor of the Defendants. *See* Opposition at 13–14. The Defendants also argue Bellemead has failed to allege "critical conditions precedent" to the filing of the Complaint, but does not indicate what these "critical" allegations are. *See id.* at 14.

In response, Bellemead argues, although the Complaint specifically cites to the Fringe Benefit Act instead of the Construction Lien Law, "the balance of the Complaint more generically alleges that [the Defendants] have 'repeatedly filed construction lien claims' against Bellemead, and the relief requested is primarily a declaration that [the Defendants'] lien claims are preempted by ERISA and an injunction to prevent them from filing such claims in the future. While a

On 20 October 1997, the Defendants filed an answer (the "Answer").[6] *See* Answer. On 7 November 1997, an amended answer (the "Amended Answer"), counterclaim (the "Counterclaim") and third party complaint (the "Third Party Complaint") were filed by the Defendants to enforce their construction lien claims.[7] *See* O'Driscoll Aff. at ¶ 19. The Counterclaim and Third Party Complaint request a judgment against Violet and Bellemead to enforce a construction claim together with interest and costs of suit, attorneys' fees and such other relief as deemed just and appropriate. *See* Counterclaim and Third Party Complaint at p. 8. No independent basis of jurisdiction is asserted over the Third Party Complaint. *See* Counterclaim and Third Party Complaint at ¶ 36. The Defendants allege jurisdiction over the Counterclaim and Third Party Complaint exists because "[Bellemead] has initiated suit in this Court challenging the lien claim filed by the [Defendants]." *Id.*

### C. *Background*
#### 1. *Contributions Due From Violet*

Violet entered into a contract with Bellemead for the performance of work at the Waterview Project. *See* Laufenberg Aff. at ¶ 16; Counterclaim and Third Party Complaint at ¶ 44. Violet in turn hired members of Carpenters 620 to work on the Waterview Project. *See* Counterclaim and Third Party Complaint at ¶ 45.

Violet is a party to a collective bargaining agreement with Carpenters 620 and the Funds. *See* Laufenberg Aff. at ¶ 15; Counterclaim and Third Party Complaint at ¶ 46. Pursuant to this agreement, Violet is required to remit fringe benefit contributions to the Funds for each member of Carpenters 620 who performed work for Violet. *See* Laufenberg Aff. at ¶ 15; Counterclaim and Third Party Complaint at ¶ 47. Also, the collective bargaining agreement states a contractor who is delinquent in payment of fringe benefit contributions is also liable for attorneys' fees incurred in enforcing those payments. *See* Counterclaim and Third Party Complaint at ¶ 48.

On or around July 1997,[8] Violet was delinquent on fringe benefit contributions due to

---

technical amendment of the Complaint may be in order, [Bellemead is] not even certain that [an amendment] is required." *Id.* at p. 2.

Rule 8(a)(2) of the Federal Rules of Civil Procedure states that a pleading shall include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* A concise, clear statement is all that is needed because "the [F]ederal rules are based on notice pleading rather than fact pleading." *United States v. Jones,* 916 F.Supp. 383, 385 (D.N.J. 1995) (citing *Universe Tankships, Inc. v. United States,* 528 F.2d 73, 75 (3d Cir.1975)). The *Jones* court explained:

> The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he [or she] bases his [or her] claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests . . . . . Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.

*Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Pursuant to the liberal notice pleading standard, the Defendants were sufficiently aware the Complaint asserted claims based upon the filing of liens against the Defendants for fringe benefit contributions whether or not those liens were specifically filed pursuant to the Fringe Benefit Act. Accordingly, summary judgment in favor of the Defendants based upon alleged deficiencies in the Complaint is denied.

6. The Complaint also asserted a claim against Zazzali, Zazzali, Fagella & Nowak (the "Firm"), counsel to the Defendants. *See* Complaint at ¶¶ 29–35. On 28 October 1997, a stipulation dismissing the Firm as a defendant was filed. *See* Stipulation of Dismissal as to Firm.

7. Violet has not filed an answer to the Third Party Complaint and has not made an appearance in the instant action.

8. Previously on or about 3 May 1997, the Firm notified Bellemead of a construction lien claim filed pursuant to the Construction Lien Law for fringe benefits owed to Carpenters 455 in connection with a Bellemead project. *See* Meisler Aff. at ¶ 2; O'Driscoll Aff. at ¶ 3. General Counsel for Bellemead responded by letter, dated 23 May 1997 (the "23 May 1997 Letter"), and stated there was no legal or statutory authority for Carpenters 455 to file a construction lien for the amounts claimed and indicated that Bellemead would take action against the Firm in the event that such claims were not released. *See id.* at ¶ 3; 23 May 1997 Letter attached as Exh. A to

the Funds for work performed on the Water-view Project.[9] *See* O'Driscoll Aff. at ¶ 6. By letter, dated 11 July 1997 (the "11 July 1997 Letter"), counsel for the Defendants wrote to Joanne Meisler, Esq. ("Meisler"), General Counsel for Bellemead, informing Bellemead of Violet's delinquency and requesting re-solvement of this issue "without the necessity of filing a lien claim." *See id.;* 11 July 1997 Letter attached as Exh. A to O'Driscoll Aff. The 11 July 1997 Letter indicated the delin-quency totaled $ 4,517.16. *See* O'Driscoll Aff. at ¶ 6; 11 July 1997 Letter attached as Exh. A to O'Driscoll Aff. Violet also failed to pay, pursuant to the collective bargaining agree-ment, interest on the debt and attorneys' fees in the amount of $1,129.29. *See* Laufen-berg Aff. at ¶ 18; Third Party Complaint at ¶ 50.

By letter, dated 14 July 1997 (the "14 July 1997 Letter"), Meisler indicated the Firm had no legal or statutory authority to file a construction lien claim against Bellemead. *See* O'Driscoll Aff. at ¶ 7; Meisler Aff. at ¶ 5; 14 July 1997 Letter attached as Exh. B to Meisler Aff. The 14 July 1997 Letter also indicated Bellemead would take action against the Firm in the event that such claims were not released. *See* Meisler Aff. at ¶ 5; 14 July 1997 Letter attached as Exh. B to Meisler Aff.

On or about 29 August 1997, as a result of the failure of Violet to pay the Defendants the amounts due, the Defendants filed a con-struction lien claim with the Clerk of Morris County against the Waterview Project. *See* Laufenberg Aff. at ¶ 19. In addition to filing the construction lien claim, and in accordance with the terms of the collective bargaining agreement and declarations of trust, the De-fendants proceeded to arbitrate a claim against Violet for the amounts due and ow-ing. *See id.* at ¶ 20; O'Driscoll Aff. at ¶ 10. On 8 September 1997, an arbitration hearing (the "Arbitration") was held. *See* O'Driscoll Aff. at ¶ 11. Although having received due notice of the Arbitration, a representative from Violet did not appear. *See id.* at ¶ 11. A default arbitration award was entered mandating payment of the amounts due on the Waterview Project, as well as other pro-jects in which Violet employed members of the Unions. *See id.*

Violet did not comply with the Arbitration award. *See* O'Driscoll Aff. at ¶ 12; Laufen-berg Aff. at ¶ 22. The Defendants proceeded to confirm the award in the United States District Court for the District of New Jersey. *See* O'Driscoll Aff. at ¶ 12; Laufenberg Aff. at ¶ 22. On or about 14 November 1997, an order confirming the Arbitration award against Violet was filed. *See* O'Driscoll Aff. at ¶ 12; Laufenberg Aff. at ¶ 22. The claim remains unsatisfied. *See* O'Driscoll Aff. at ¶ 13; Laufenberg Aff. at ¶ 23.

### 2. *Contributions Due From Architectural*

Architectural is a party to a collective bar-gaining agreement with Carpenters 455 and the Funds. *See* Counterclaim and Third Party Complaint at ¶ 57. Bellemead entered into a contract with Architectural for the performance of work on the Independence Project. *See id.* at ¶ 55. Architectural hired members of Carpenters 455 to work on the Independence Project. *See id.* at ¶ 56.

Pursuant to the collective bargaining agreement entered into between Architectur-al and Carpenters 455, Architectural agreed to remit fringe benefit contributions to the Funds for each member of Carpenters 455 employed on the Independence Project. *See* Counterclaim and Third Party Complaint at ¶ 58. Architectural failed to remit payment to the Funds for the work performed by members of Carpenters 455. *See id.* at ¶ 60. The amount of delinquent fringe benefit con-tributions due and owing on the Indepen-dence Project was $4,285.84. *See id.* at ¶ 61. Pursuant to the collective bargaining agree-ment, Architectural was also liable for attor-neys' fees of $1,071.46. *See id.*

---

Meisler Aff. Subsequently, the claim was satisfied in full by Violet and discharged accordingly on or about 5 June 1997. *See* O'Driscoll Aff. at ¶ 4; 23 May 1997 Letter; Exh. A attached to Meisler Aff.

9. Violet is a signatory to a collective bargaining agreement with Carpenters 620. *See* Laufenberg Aff. at ¶ 15. Pursuant to this agreement, Violet is obligated to remit fringe benefit contributions to the Funds for each member of the Unions who performed work for Violet. *See id.*

On or about 1 August 1997, as a result of the failure of Architectural to remit fringe benefit contributions to the Funds, the Defendants filed a construction lien claim with the Clerk of Somerset County against the Independence Project in accordance with the Construction Lien Law. *See* Laufenberg Aff. at ¶ 11.

On or about 17 November 1997, Architectural satisfied its delinquency to the Defendants. *See* Laufenberg Aff. at ¶ 12. As indicated, Architectural has been dismissed as a third party defendant in the instant matter. *See id.*

Bellemead has entered into agreements to sell certain assets, including properties upon which the Defendants have filed the construction liens. *See* Complaint ¶¶ 20, 27; Meisler Aff. at ¶ 9.

*Discussion*

A. *Subject Matter Jurisdiction*

 Jurisdiction over ERISA preemption claims exists pursuant to 28 U.S.C. § 1331. A plaintiff, "in order . . . to secure the relief sought . . . will be obliged to establish both the correctness and the applicability to [its] case of a proposition of [F]ederal law," thereby establishing subject matter jurisdiction. *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Additionally, "[a] plaintiff who seeks injunctive relief from state regulation on the ground that such regulation is preempted by a [F]ederal statute which by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a[F]ederal question which the [F]ederal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Keystone Chapter, Associated Builders and Contractors, Inc. v. Foley,* 37 F.3d 945, 953 (3d Cir.1994) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)), *cert. denied,* 514 U.S. 1032, 115 S.Ct. 1393, 131 L.Ed.2d 244 (1995); *see Alltel Tenn., Inc. v. Tennessee Public Serv. Com'n,* 913 F.2d 305, 308 (6th Cir.1990) (subject matter exists over action wherein party seeks declaratory and injunctive relief from state regulation based upon preemption); *Northeast Dep't ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147, 156 (3d Cir.1985); *Oracare DPO, Inc. v. Merin,* CIV.A.No. 88-4171, 1989 WL 23108, at * 3 (D.N.J. 8 Mar. 1989); *see also Shaw,* 463 U.S. at 96 n. 14, 103 S.Ct. 2890.

Accordingly, subject matter jurisdiction exists because, in the instant matter, Bellemead is seeking, *inter alia,* injunctive relief from the Construction Lien Law on the ground that this statute is preempted by ERISA.

B. *Standard for Summary Judgment*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Witco Corp. v. Beekhuis,* 38 F.3d 682, 686 (3d Cir.1994). A district court, however, may not resolve factual disputes on a motion for summary judgment. *See Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir.1995) ("at the summary judgment stage, 'the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial' ") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir. 1992).

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir. 1983) (the court must resolve "all inferences, doubts and issues of credibility . . . against the moving party").

When the resolution of issues depends wholly upon the interpretation of specific statutory language and the applicable law, summary judgment is appropriate. *See DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 724 (3d Cir.), *cert. denied,* 516 U.S. 916, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *see also Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) ("summary judgment is proper where the facts are undisputed"), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Estate of Reddert v. United States,* 925 F.Supp. 261, 265 (D.N.J. 1996).

In addition, when the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *see Lawrence v. National Westminster Bank N.J.,* 98 F.3d 61, 65 (3d Cir.1996). Once the movant demonstrates an essential element of the nonmovant's case is lacking, the nonmovant must come forward with sufficient evidence to demonstrate there is a factual controversy as to that element. *See Anderson,* 477 U.S. at 247, 106 S.Ct. 2505; *Siegel Transfer, Inc. v. Carrier Exp., Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Witco,* 38 F.3d at 686. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *accord Siegel,* 54 F.3d at 1130–31; *Nevets*

*C.M., Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 534 (D.N.J.1989), *aff'd without op'n,* 899 F.2d 1218 (3d Cir.1990); *Guerrier v. Advest, Inc.,* CIV.A.No. 90–709, 1993 WL 90404, at * 2 (D.N.J. 25 Mar.1993).

If the nonmovant fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *See Celotex,* 477 U.S. at 321, 106 S.Ct. 2548; *Siegel,* 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

## C. *ERISA Preemption*

The goal of ERISA is to protect the interests of employees and their beneficiaries who are members of employee benefit plans.[10] *See Shaw,* 463 U.S. at 90, 103 S.Ct. 2890; *Keystone,* 37 F.3d at 954; *see also Plumbing Indus. Bd. v. E.W. Howell Co.,* 126 F.3d 61, 66 (2d Cir.1997). ERISA accomplishes its aims not by mandating employers provide a certain level of benefits, but by regulating and overseeing the administration of such plans through rules concerning participation, funding and vesting. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 651, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *E.W. Howell Co.,* 126 F.3d at 66; *Bricklayers and Allied Craftsmen Int'l Union Local 33 Benefit Funds v. America's Marble Source,*

---

**10.** ERISA defines an "employee benefit plan" as an "employee welfare benefit plan or an employee pension benefit plan or a plan which is both." 29 U.S.C. § 1002(3) ("Section 1002(3)"). An employee welfare benefit plan is any "plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both" to provide, through the purchase of insurance or otherwise, "(A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in [29 U.S.C. § ] 186(c)

[("Section 186(c)")] of this title (other than pensions on retirement or death, and insurance to provide such pensions)." 29 U.S.C. § 1002(1). Section 186(c) covers union welfare funds for benefits including scholarships, vacation benefits and housing assistance. *See* Section 186(c).

An employee pension benefit plan is "any plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both ... [that] (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond...." 29 U.S.C. § 1002(2)(A).

*Inc.,* 950 F.2d 114, 117 (3d Cir.1991). The provisions of ERISA subject employee benefit plans to uniform standards on issues such as disclosure, reporting and fiduciary responsibility. *See Travelers,* 514 U.S. at 651, 115 S.Ct. 1671; *Keystone,* 37 F.3d at 954 (citing *Shaw,* 463 U.S. at 90–91, 103 S.Ct. 2890); *Bricklayers,* 950 F.2d at 117; *see also E.W. Howell Co.,* 126 F.3d at 66. ERISA also promotes and increases administrative efficiency through the exclusive Federal regulation of governed plans. *See Keystone,* 37 F.3d at 954. Further, ERISA provides for administrative oversight, establishes a civil enforcement scheme and imposes criminal penalties. *See Travelers,* 514 U.S. at 651, 115 S.Ct. 1671; *E.W. Howell Co.,* 126 F.3d at 66.

ERISA applies to pension benefit plans and plans for welfare benefits including medical benefits, daycare centers and training programs. *See* Section 1002(3). Usually, these plans require " 'an ongoing administrative program for processing claims and paying benefits.' " *Keystone,* 37 F.3d at 954 (quoting *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 12, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)).

Section 514(a) ("Section 514(a)") of ERISA, 29 U.S.C. § 1144(a), facilitates the uniform regulation of employee benefit plans, by preempting "any and all [s]tate laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. *See* Section 514(a); *see also Ragan v. Tri–County Excavating, Inc.,* 62 F.3d 501, 510 (3d Cir.1995) (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 829, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (quoting Section 514(a))); *Bricklayers,* 950 F.2d at 117 (quoting same). Limited exceptions to Section 514(a) exist, none of which are applicable in the instant matter.[11] *See* Section 514(a). In enacting Section 514(a), Congress principally sought to address the concern that a lack of uniformity and the financial and administrative burdens associated with complying with conflicting state laws might work to the detriment of employee benefit plan beneficiaries. *See E.W. How-*

*ell Co.,* 126 F.3d at 66. Additionally, in enacting Section 514(a), Congress intended to address the possibility conflicting state regulation might reduce the willingness of employers to adopt and implement ERISA plans, or reduce the level of benefits furnished. *See id.* (citing *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)).

Early attempts at interpreting Section 514(a) heavily relied upon "textual analysis and a dictionary definition of 'relate to.' " *See E.W. Howell Co.,* 126 F.3d at 66 (quoting *Shaw,* 463 U.S. at 96–97, 103 S.Ct. 2890) (using a Black's Law Dictionary definition to aid in the determination that a state law " 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan"). The Supreme Court, however, has recently "moved away from this form of 'uncritical literalism.' " *Id.* (quoting *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, ——, 117 S.Ct. 832, 838, 136 L.Ed.2d 791 (1997) (citing *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671)). This trend in interpretation results from the realization of the Court that if the "relate to" language contained in Section 514(a) were read literally, the preemptive effect of ERISA would be limitless. *See De Buono v. NYSA–ILA Medical and Clinical Servs. Fund,* 520 U.S. 806, ——, 117 S.Ct. 1747, 1751, 138 L.Ed.2d 21 (1997) (citing *Travelers,* 514 U.S. at 655, 115 S.Ct. 1671); *E.W. Howell Co.,* 126 F.3d at 66. "In other words, the phrase 'relate to' for purposes of legal analysis proved to be a verbal coat of too many colors." *E.W. Howell Co.,* 126 F.3d at 66.

■ Recent decisions of the Supreme Court have instructed that analysis under Section 514(a) must commence with the "starting presumption that Congress does not intend to supplant state law," *DeBuono,* 520 U.S. at ——, 117 S.Ct. at 1751 (quoting *Travelers,* 514 U.S. at 654, 115 S.Ct. 1671); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (quotation omitted). These decisions have also stressed when applying Section

---

11. Any state law regulating insurance, banking or securities is exempted from ERISA, *see* Sec-

tion 514(b)(2)(A), as is "any generally applicable criminal law of a[s]tate." *See* Section 514(b)(4).

514(a), a court should "look ... to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Dillingham Constr.*, 519 U.S. at ——, 117 S.Ct. at 838 (quoting *Travelers*, 514 U.S. at 656, 115 S.Ct. 1671). Such review should avoid a construction of Section 514(a) that theoretically is unending. *See E.W. Howell Co.*, 126 F.3d at 67. Accordingly, to overcome this anti-preemption presumption, a litigant challenging a state law must persuade a court there is something within the practical operation of the challenged state statute to evidence it is included within the types of laws Congress specifically contemplated to have ERISA supersede. *See E.W. Howell Co.*, 126 F.3d at 67 (citing *De Buono*, 520 U.S. at ——, 117 S.Ct. at 1751–52).

■ The Supreme Court has identified a number of instances where the anti-preemption presumption is overcome. Section 514(a) states, in pertinent part, "ERISA preempts any and all [s]tate laws insofar as they may now or hereafter relate to any employee benefit plan." Section 514(a). Preemption pursuant to Section 514(a) is applicable where a state law "refers to" ERISA plans because the state law "acts immediately and exclusively upon ERISA plans" or where "the existence of ERISA plans is essential to the law's operation." *Dillingham Constr.*, 519 U.S. at ——, 117 S.Ct. at 838. Also, a state law is preempted if it has a "connection with" an employee plan in the sense that it "mandate[s] employee benefit structures or their administration" or "provid[es] alternative enforcement mechanisms." *Travelers*, 514 U.S. at 658, 115 S.Ct. 1671.

■ Outside these aforementioned areas, the presumption against preemption pursuant to Section 514(a) is considerable. State laws of general application only imposing some burdens on the administration of ERISA benefit plans which are not "so acute" as to force an ERISA plan to restrict its choice of insurers or to adopt certain substantive coverage should not be disturbed. *See De Buono*, 520 U.S. at —— & n. 16, 117 S.Ct. at 1753 & n. 16.

### 1. *"Refers to" Inquiry*

■ The Construction Lien Law states, in pertinent part:

Any contractor, subcontractor or supplier who provides work, services, material or equipment pursuant to a contract, shall be entitled to a lien for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based upon the contract price, subject to the provisions of [2A:44A–9 and 2A:44A–10] of this act. The lien shall attach to the interest of the owner in the real property. If a tenant contracts for improvement of the real property and the contract for improvement has not been authorized in writing by the owner of a fee simple interest in the improved real property, the lien shall attach only to the leasehold interest of the tenant.

Nothing in this act shall be construed to limit the right of any claimant from pursuing any other remedy provided by law. *Id.* (footnote omitted).

■ As previously mentioned, a state law "refers to" an ERISA plan if it expressly imposes requirements upon ERISA plan. *See Dillingham Constr.*, 519 U.S. at ——, 117 S.Ct. at 837 (citing *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130–31, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992)). A state law also refers to an ERISA plan if it is premised upon the existence of an ERISA plan, if it acts immediately and exclusively upon such plans or if the ERISA plan is essential to the operation of the state law. *See id.*, 519 U.S. at ——, 117 S.Ct. at 837–38; *Mackey*, 486 U.S. at 829, 108 S.Ct. 2182; *United Wire, Metal & Machine Health and Welfare Fund v. Morristown Memorial Hospital*, 995 F.2d 1179, 1192 (3d Cir.), *cert. denied*, 510 U.S. 1031, 114 S.Ct. 651, 126 L.Ed.2d 608 (1993); *Bricklayers*, 950 F.2d at 117.

In the instant matter, the Construction Lien Law, a law of general application, does not explicitly mention ERISA or an ERISA plan. The Construction Lien Law also was not specifically designed to affect an ERISA plan, does not single out an ERISA plan for special treatment or create rights or duties unique to an ERISA plan. *See, e.g., Greater*

*Washington Bd. of Trade,* 506 U.S. 125, 113 S.Ct. 580 (ERISA preempts a District of Columbia statute that required employers who provide health insurance for their employees to provide equivalent health insurance coverage for injured employees eligible for workers' compensation benefits); *Mackey,* 486 U.S. at 830, 108 S.Ct. 2182 (striking down a Georgia law that specifically exempted ERISA plans from a generally applicable garnishment procedure). The Construction Lien Law does not "refer to" ERISA or an ERISA plan.

### 2. *"Connection With" Inquiry*

A state law also "relates to" an ERISA plan for purposes of Section 514(a) if it has a "connection with" such a plan. *See Travelers,* 514 U.S. at 656, 115 S.Ct. 1671. The *Travelers* Court explained:

> For the same reasons that infinite relations cannot be the measure of pre[ ]emption, neither can infinite connections. We simply must go beyond the unhelpful text and the frustrating difficulty of defining [ERISA's] key term, and look instead to the objective of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.

*Id.*

As indicated, ERISA is a comprehensive Federal statute designed and intended to promote and preserve the interests of employees and their beneficiaries in employee benefit funds. *See Shaw,* 463 U.S. at 90, 103 S.Ct. 2890; *Keystone,* 37 F.3d at 954; *see also E.W. Howell Co.,* 126 F.3d at 66. The Supreme Court has recognized that:

> In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds.... To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator.

*Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (citations omitted).

To determine if a state law has such a connection, a court must go beyond the text of ERISA and instead examine " 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.' " *See Dillingham Constr.,* 519 U.S. at ——, 117 S.Ct. at 838 (quoting *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671). Also, the nature of the impact the state law has on an ERISA plan should be examined. *See id.* (quoting *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671).

In light of the stated objectives in enacting ERISA and Section 514(a), Congress intended at least three types of state laws would be preempted because they have a connection with an ERISA benefit plan. First, congressional intent evidences ERISA preempts state laws that "mandate[ ] employee benefit structures or their administration." *See Travelers,* 514 U.S. at 658, 115 S.Ct. 1671. Such a state law was preempted in *Shaw* where the state law "prohibit[ed] employers from structuring benefit plans in a manner that discriminate[d] on the basis of pregnancy." [12] 463 U.S. at 97, 103 S.Ct. 2890. Preemption pursuant to Section 514(a) was necessary in *Shaw* because the mandates of the aforementioned state statutes "affecting coverage could have been honored only be varying the subjects of a plan's benefits whenever New York law might have applied...." *Travelers,* 514 U.S. at 657, 115 S.Ct. 1671 (citing *Shaw,* 463 U.S. at 97, 103 S.Ct. 2890). Thus, without ERISA preemption, conflicting directives from state-to-state would have been unavoidable. *See Shaw,* 463 U.S. at 99, 103 S.Ct. 2890.

Second, Congress intended Section 514(a) would preempt state laws binding plan administrators or employers to any particular choice of ERISA plan or preventing uniform administration of such plans. *See Travelers,* 514 U.S. at 658, 115 S.Ct. 1671. The Supreme Court in *Travelers* held ERISA did not preempt a New York statute which required hospitals to collect surcharges from

---

**12.** The *Shaw* Court also held that a separate state statute requiring employers to pay employees specific benefits was preempted. *See* 463 U.S. at 97, 103 S.Ct. 2890.

patients covered by commercial insurers but not from patients insured by Blue Cross/Blue Shield, HMOs and Medicaid (the "Blue Cross Plans"). *See id.* at 662, 115 S.Ct. 1671. New York hospitals charged an averaged rate to patients covered by one of the Blue Cross Plans. *See id.* at 650, 115 S.Ct. 1671. The hospitals added a surcharge to patients covered by commercial insurers. *See id.* The Court held the New York statute did not "relate to" employee benefit plans because its indirect economic influence did not mandate coverage by any particular insurance carrier, even though, in effect, it made the Blue Cross Plans more attractive. *See id.* at 662, 115 S.Ct. 1671.

Third, Congress intended Section 514(a) would preempt state law which "provid[e] alternative enforcement mechanisms" for employees to collect ERISA benefits. *See Travelers,* 514 U.S. at 658, 115 S.Ct. 1671 (citing *Ingersoll–Rand,* 498 U.S. at 142–44, 111 S.Ct. 478); *E.W. Howell,* 126 F.3d at 67; *Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1468 (4th Cir.1996); *Ragan,* 62 F.3d at 512–13; *Bricklayers,* 950 F.2d at 119–21. Accordingly, the Court held in *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987): "The common law causes of action raised in [the beneficiary's] complaint, each based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for pre[ ]emption under [Section 514(a) ]." *Id.* at 48, 107 S.Ct. 1549. Similarly, in *Ingersoll–Rand,* the Supreme Court held ERISA preempted "a state common law claim [against the employer] that an employee was unlawfully discharged to prevent his attainment of benefits under a plan covered by ERISA." 498 U.S. at 135, 111 S.Ct. 478.

Conversely, state laws of general application which may impose some administrative burdens on ERISA plans but, nonetheless, do not relate to ERISA plans within the meaning of Section 514(a) are not preempted. *See De Buono,* 520 U.S. at ——, 117 S.Ct. at

1752; *Dillingham Constr.,* 519 U.S. at ——, 117 S.Ct. at 842; *Travelers,* 514 U.S. at 668, 115 S.Ct. 1671; *Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. 478; *Ragan,* 62 F.3d at 511.

In arguing the Construction Lien Law is preempted, and asserting it has a connection with ERISA, Bellemead relies upon *Bricklayers* and *McMahon.* *See* Bellemead Reply at 8. Bellemead contends the Construction Lien Law impermissibly supplements the comprehensive enforcement scheme set out in ERISA " 'by creating a cause of action against, and imposing liability upon entities that [are] not parties to any agreement obligating them to contribute to a fringe benefit fund.' " *See id.* at 3–4 (quoting *Bricklayers,* 950 F.2d at 118).

The Defendants argue the Construction Lien Law is a law of general applicability, which does not contain a reference to an ERISA plan, and "is nothing more than this state's proper exercise of its traditional and historic powers." *See* Opposition at 19, 27. The Defendants primarily rely upon *Board of Trustees of Operating Engineers Local 825 Fund v. First Indemnity of Am. Ins. Co.,* 287 N.J.Super. 498, 671 A.2d 596 (App.Div.1996), *aff'd,* 148 N.J. 561, 575–76, 691 A.2d 339, *cert. denied,* —— U.S. ——, 118 S.Ct. 163, 139 L.Ed.2d 107 (1997) and *Ragan* in contending the Construction Lien Law is not preempted by ERISA. *See* Opposition at 22–24.

In *Bricklayers,* the Circuit held the Fringe Benefit Act [13] was preempted because, "by its terms, [it] 'ha[d] a connection with or reference to' " ERISA plans. *See* 950 F.2d at 118 (quoting *Shaw,* 463 U.S. at 97, 103 S.Ct. 2890). The type of funds to which the Fringe Benefit Act applied predominantly, if not entirely, consisted of benefit plans governed by ERISA. *See id.* Accordingly, the *Bricklayers* court held the Fringe Benefit Act related to an ERISA plan and was preempted. *See id.* ("It is virtually taken ... for granted that state laws which are specifically designed to affect employee benefit plans are pre[ ]empted under [Section]

---

13. The Fringe Benefit Act, in relevant part, stated:

> The provisions of this act shall apply only to fringe benefit funds which are a. located within and established for the benefit of workers in this [s]tate or b. located outside of the [s]tate but which cover workers employed by any construction employer in the construction, repair or alteration of any private project or public project within this [s]tate.
> N.J.S.A. 34:11A–3.

514(a).") (quoting *Mackey*, 486 U.S. at 829, 108 S.Ct. 2182 (internal quotations omitted)).

Additionally, the Circuit held the Fringe Benefit Act impermissibly supplemented the comprehensive enforcement scheme created by ERISA "by creating a cause of action against, and imposing liability upon, entities that were not parties to any agreement obligating them to contribute to a fringe benefit fund." *Bricklayers*, 950 F.2d at 118 (citing *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)). The *Bricklayers* court further opined the Fringe Benefit Act was preempted because it related to ERISA by regulating an area controlled by ERISA—the funding of benefit plans.[14] *See* 950 F.2d at 118. The Circuit stated:

> By creating a new cause of action and imposing liability upon project owners and prime contractors who have not agreed to make contributions, the Fringe Benefit Act regulates how ERISA plans are funded. Consequently, the Fringe Benefit Act "relate[s] to" an area already regulated by the provisions of ERISA that address the nonpayment of contributions by employers to employee benefit plans. As the district court aptly wrote in this case, "the fact that the Fringe Benefit Act may provide a complementary or more efficient means of effectuating the same purposes as ERISA is irrelevant, because the '[p]re[ ]emption provision was intended to displace all state laws that fall within its sphere....'" ... *Metropolitan Life*, 471 U.S. at 739, 105 S.Ct. 2380....

*Id.*

The Circuit observed that although the relationship between a state law and ERISA may at times be too "tenuous, remote, or peripheral" to require preemption, the Fringe Benefit Act did not affect an ERISA plan in such a way. *See Bricklayers*, 950 F.2d at 118. The Circuit observed the Fringe Benefit Act touched upon funding, one of the major components of ERISA plans. *See id.* The court explained:

> The Fringe Benefit Act creates a new cause of action and expands liability so as to help ensure the funding of ERISA plans. Funding is not a tenuous, remote or peripheral component of ERISA plans.

*Id.* at 118–19.

The Circuit relied upon *McMahon* to support its reasoning. *See Bricklayers*, 950 F.2d at 119. In *McMahon*, former employees of a Pennsylvanian company attempted to collect unpaid employee benefit plan contributions from directors and officers of the company pursuant to the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa.Cons.Stat.Ann. § 260.1 *et seq.*[15] *See* 794 F.2d at 103. The *McMahon* court held the WPCL was preempted insofar as it imposed liability upon the individual defendants. *See id.* at 106–07. The Circuit stated:

> Insofar as the WPCL authorizes the liability of [the company] or of its directors and officers for unpaid employee benefit plan obligations, it obviously relates, refers, and pertains to the underlying employee benefit plans. The WPCL itself explicitly includes ERISA plans within its scope. [*See* ] 43 Pa.Stat.Ann. § 260.2a (1985 Supp.). Indeed, the very existence of liability for unpaid pension contributions is,

**14.** The Circuit relied upon the broad preemptive intent of Congress found in the words "relate to" to find further support for its holding. *See Bricklayers*, 950 F.2d at 120. The court quoted the comments of Senator Williams, a sponsor of ERISA:

> It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent [s]tate and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of [s]tate or local governments, or any instrumen-

tality thereof, which have the force and effect of law.

*Id.* (quoting *Dedeaux*, 481 U.S. at 46, 107 S.Ct. 1549 (quoting 120 Cong.Rec. at 29,933 (1974))).

**15.** The WPCL reads, in relevant part:

> Every employer shall pay all wages, other than fringe benefits and wage supplements, due to his employees on regular paydays designated in advance by the employer....
> Every employer who ... agrees to pay or provide fringe benefits or wage supplements, must remit the deductions or pay or provide the fringe benefits or wage supplements ...

43 Pa.Stat.Ann. § 260.3(a) & (b) (1985 Supp.).

in the first instance, a result of the federal scheme. Plaintiffs would be able to determine the amount of any recovery under the WPCL only by reference to the benefit plans and the provisions of ERISA.

. . . .

Moreover, the WPCL, as invoked by plaintiffs, does not merely relate to [the company's] pension plans, it competes with the mechanism that Congress carefully established in ERISA itself. Congress set in place particular processes for the recovery of delinquent contributions: [ERISA] places the obligation for funding and the penalty for underfunding on the person on whom it belongs—namely, the employer. *Id.* at 106.

The *Bricklayers* court also cited to *Iron Workers Mid–South Pension Fund v. Terotechnology Corp.,* 891 F.2d 548 (5th Cir.), *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3272, 111 L.Ed.2d 782 (1990).[16] In *Iron Workers,* the court examined the Louisiana Private Works Act (the "LPWA") which provided a state remedy for collection of unpaid contributions due from an employer pursuant to a collective bargaining agreement.[17] *See* 891 F.2d at 550. In *Iron Workers,* a subcontractor failed to remit contributions due and owing for fringe benefit funds pursuant to a collective bargaining agreement. *See id.* Accordingly, the funds and the unions filed liens under the LPWA against the owner of

the property and the contractor. *See id.* The *Iron Workers* court held ERISA preempted the LPWA because "[t]he [LPWA] relates to ERISA plans by its terms, as it provides an alternative method to enforce the collection of contributions owned to plans." *Id.* at 556.

The *Iron Workers* court also observed the LPWA "specifically attempt[ed] to regulate the funding of employee benefit plans, and attempt[ed] to provide an enforcement mechanism not provided by ERISA." 950 F.2d at 554. Additionally, the court explained ERISA was affected by imposing liability upon a party other than the responsible employer for the payments and by creating an additional method of enforcement not present in ERISA. *See id.* at 556.

Although *Bricklayers* may appear to indicate ERISA preempts the Construction Lien Law, further analysis of applicable authority is necessary. Specifically, the decision of the Circuit in *Ragan* must be addressed. The Circuit in *Ragan* analyzed whether a common law action to recover under a private bond contract was preempted by Section 514(a). *See* 62 F.3d at 511.

In *Ragan,* the defendant insurance company was a surety (the "Surety") on a material and labor bond purchased by Mele Construction Company ("Mele"). *See* 62 F.3d at 503. The bond required potential claimants not in

---

**16.** Additionally, the *Bricklayers* court relied upon *Carpenters S. Cal. Admin. Corp. v. El Capitan Dev. Co.,* 53 Cal.3d 1041, 282 Cal.Rptr. 277, 811 P.2d 296, *cert. denied,* 502 U.S. 963, 112 S.Ct. 430, 116 L.Ed.2d 450 (1991), in support of its holding. *El Capitan* involved a statute which provided that:

> [A]n express trust fund established pursuant to a collective bargaining agreement to which payments are required to be made on account of fringe benefits supplemental to a wage agreement for the benefit of a claimant on particular real property shall have a lien on such property in the amount of the supplemental fringe benefit payments owning to it pursuant to the collective bargaining agreement.

282 Cal.Rptr. 277, 811 P.2d at 297 n. 1.

The court held this statute was preempted by ERISA because it was "specifically designed to affect employee benefit plans," and because it regulated ERISA plans "by providing an additional method of funding." *El Capitan,* 282 Cal. Rptr. 277, 811 P.2d at 302.

**17.** The LPWA states, in pertinent part:

> Amounts owed under collective bargaining agreements with respect to a laborer's or employee's wages or other compensation for which a claim or privilege is granted and which are payable to other persons for vacation, health and welfare, pension, apprenticeship and training, supplemental unemployment benefits, and other fringe benefits considered as wages by the secretary of labor of the United States in determining prevailing wage rates, unless the immovable upon which the work is performed is designed or intended to be occupied primarily as a residence by four families or less. Trustees, trust funds, or other persons to whom the employer is to make such payments may assert and enforce claims for the amounts in the same manner and subject to the same procedures provided for other amounts due laborers or employees granted a claim or privilege under this part.

La.Rev.Stat.Ann. § 9:4803(A)(3) (West 1983).

"direct contact" with Mele to provide written notice of claims within ninety days after completing work. *See id.* Plaintiffs, a union and the administrator of various fringe benefit funds connected with the union, did not provide such notice within the proscribed period. *See id.*

The union had entered into a collective bargaining agreement with Tri–County Excavating, Inc. ("Tri–County"), a corporation jointly owned by three daughters of the president of Mele. *See Ragan,* 62 F.3d at 503. The union had provided work to Tri–County and made a claim pursuant to the bond approximately 120 days after work ceased. *See id.* The Surety rejected the claim of the union as untimely because Tri–County was not in "direct contact" with Mele and, pursuant to the bond, notice was required within ninety days of ceasing work. *See id.*

The *Ragan* trial court held Tri–County was the alter ego of Mele and ruled in favor of the union. *See Ragan,* 62 F.3d at 503. On appeal, *inter alia,* the Surety argued ERISA preempted the state law action asserted by the union on the bond. *See id.*

The Circuit began by stressing the cause of action asserted by the union on the bond did not specifically refer to ERISA. *See Ragan,* 62 F.3d at 511. It stated that "such common law causes of action are [based upon] 'generally applicable' laws that 'make[ ] no reference to, [and] indeed function[ ] irrespective of, the existence of an ERISA plan.'" *Id.* (quoting *Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. 478).

The Circuit further observed the trial court was not required to determine obligations due and owing under the bond or make an inquiry into the status or validity of the funds. *See id.* The Circuit reasoned "[t]he fact that the claimant under the bond happens to be an ERISA fund is not the kind of 'critical factor in establishing liability' that prompted preemption in *Ingersoll–Rand.'*" *Id.* (quoting *Ingersoll–Rand,* 498 U.S. at 139–140, 111 S.Ct. 478). For this reason, the Circuit found the reliance by the Surety upon, *inter alia, Bricklayers* was inapposite. *See id.* at 511 n. 6. The Court further observed "[t]he New Jersey statute challenged in *Bricklayers* [, the Fringe Benefit Act], was

'specifically designed to affect employee benefit plans,' *Bricklayers,* 950 F.2d at 118 (quoting *Mackey,* 486 U.S. at 829, 108 S.Ct. 2182), and, as such, was clearly within the preemption doctrine." *Id.* (citation form altered when necessary).

The *Ragan* court also opined conflict preemption did not exist. *See* 62 F.3d at 512. The Circuit observed the civil enforcement remedies in ERISA were meant to be exclusive. *See id.* (citing *Dedeaux,* 481 U.S. at 51, 107 S.Ct. 1549). The Circuit stated that even a state cause of action is preempted by Section 514(a) if it directly conflicts with a cause of action provided for by ERISA. *See id.* (citing *Ingersoll–Rand,* 498 U.S. at 142, 111 S.Ct. 478).

The Circuit acknowledged 29 U.S.C. § 502 ("Section 502") and section 515 ("Section 515"), 29 U.S.C. § 1145, "'provide a cause of action and remedies for an *employer's* failure to fulfill its obligations to make pension or welfare fund contributions pursuant to a plan or collective bargaining agreement.'" *Ragan,* 62 F.3d at 512 (quoting *Bricklayers,* 950 F.2d at 117) (emphasis added by *Ragan* court).

The *Ragan* court stated ERISA defines an "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." 29 U.S.C. § 1002(5). The Circuit agreed with other courts which have all but unanimously held sureties are not included within this definition. *See id.* (citation omitted).

The Circuit observed a surety does not act in the interest of the employer but, rather, serves in the interest of the beneficiaries on the bond. *See Ragan,* 62 F.3d at 512–13; *Greenblatt v. Delta Plumbing & Heating Corp.,* 68 F.3d 561, 576 (2d Cir.1995); *First Indemnity,* 287 N.J.Super. at 508, 671 A.2d 596; *see also Selman,* 98 F.3d at 1471 (holding common law action by individuals who were neither beneficiaries nor participants was not an alternate enforcement mechanism for recovering ERISA benefits); *Bleiler v. Cristwood Constr., Inc.,* 72 F.3d 13, 15 (2d Cir.1995) (surety is not an employer under ERISA). The *Ragan* court concluded the

Surety, "which is neither the employer of [the union's] operating engineers nor acting 'in the interest of' their employer, c[ould]not claim ERISA preemption." 62 F.3d at 513.

The reasoning of *Ragan*, by analogy, applies to the instant situation. Bellemead was not a signatory to the collective bargaining agreement between Violet and Carpenters 620. Bellemead, the general contractor, did not " 'act[ ] directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan.' " *Ragan*, 62 F.3d at 512 (quoting Section 1002(5)). Nowhere is it suggested Bellemead owned Violet, served as its agent or assumed its responsibilities concerning an ERISA plan. *Ragan* indicates that without a cause of action asserted against an *employer* there is no "conflict preemption" under ERISA. *See id.; see also Burgio and Campofelice, Inc. v. New York State Dept. of Labor*, 107 F.3d 1000, 1010 (2nd Cir.1997) (contractor as a non-signatory to collective bargaining agreement cannot be held liable as an employer under ERISA); *Bleiler*, 72 F.3d at 15 (extending reasoning that surety is not an employer to contractor).

Additional support is found in *Hawaii Laborers' Trust Funds v. Maui Prince Hotel*, 81 Hawai'i 487, 918 P.2d 1143 (1996). In *Maui Prince Hotel*, the plaintiff trust fund commenced suit to foreclose its mechanic's and materialman's liens [18] on properties held by the owner to enforce judgments awarded against subcontractors for overdue ERISA plan contributions. *See* 918 P.2d at 1146.

The court commenced its analysis by outlining the history and evolution of ERISA preemption and observed the United States Supreme Court had not specifically addressed whether a generic and neutral state lien law, "relates to" ERISA. *See Maui Prince Hotel*, 918 P.2d at 1152. The court commented *Trustees of Electrical Workers Health and Welfare Trust v. Marjo Corp.*, 988 F.2d 865 (9th Cir.1992) [19] and *El Capitan* [20] were distinguishable because both of those cases involved state laws specifically referencing ERISA or an ERISA plan while the Hawaii Lien Law was a neutral statute. *See id.* at 1153 n. 13. The court found *Plumber's Local 458 Holiday Vacation Fund v. Howard Immel, Inc.*, 151 Wis.2d 233, 445 N.W.2d 43 (Ct.App.1989), was factually analogous and looked to it to guide its analysis. *See id.* at 1153.

In *Immel*, the trial court concluded a state lien law only had a "tenuous, remote and peripheral" effect on ERISA plans and, accordingly, was not preempted by ERISA. [21] *See* 445 N.W.2d at 44. The court held ERISA did not preempt the state statute which provided rights to a general creditor. *See id.* at 46. The ERISA plan was permitted to use the state construction lien statute to collect contributions due pursuant to the master labor agreement. *See id.*

The *Maui Prince Hotel* court held the Hawaii Lien Law "merely provide[d] a 'remedy available to a certain class of creditors

---

**18.** The Hawaii State Mechanic's and Materialman's Lien Law (the "Hawaii Lien Law"), HRS § 507–42 (1993), provides:

When allowed; lessees, etc. Any person or association of persons furnishing labor or material in the improvement of real property shall have a lien upon the improvement as well as upon the interest of the owner of the improvement in the real property upon which the same is situated, or for the benefit of which the same was constructed, for the price agreed to be paid (if the price does not exceed the value of the labor and materials), or if the price exceeds the value thereof or if no price is agreed upon by the contracting parties, for fair and reasonable value of all labor and materials covered by their contract, express or implied.

*Id.*

**19.** *See infra*, n. 23.

**20.** The *Bricklayers* court relied upon *El Capitan* to support its holding that the Fringe Benefit Act was preempted by ERISA. *See supra*, n. 15. The *Ragan* court distinguished *Bricklayers*. *See Ragan*, 62 F.3d at 511 n. 6

**21.** The key provision of the lien statute at issue in *Immel* states:

In any case in which an improvement is constructed or to be constructed pursuant to a contract and payment bond under § 779.035, any person furnishing labor ... to any prime contractor or subcontractor shall have a lien on the money or other payment due or to become due the prime contractor or subcontractor; therefore, if the lienor, before payment is made to the prime contractor or subcontractor, gives written notice of the lienor's claim. . . .

Wisconsin Lien Statute § 779.036(1).

that transcends ERISA obligation and concerns'" and, accordingly, did not relate to ERISA. *Id.* at 1154 (quoting *Immel,* 445 N.W.2d at 46).

The *Maui Prince Hotel* court further observed the purpose of Section 514(a) is to "'afford employers [or fund trustees of multiemployer benefit plans] the advantages of a uniform set of administrative procedures'" so as to avoid "'the burden that would be imposed by a patchwork scheme of regulation.'" 918 P.2d at 1154 (quoting *Fort Halifax Packing,* 482 U.S. at 11–12, 107 S.Ct. 2211). The court commented a nonsensical result would occur if the trustees of the ERISA funds themselves were unable to use a state law available to general creditors to collect unpaid contributions. *See id.*

The court also stated the problem of collecting unpaid contributions from employers resulted in the passage of the Multiemployer Pension Plan Amendments Act of 1980, P.L. 96–364, 94 Stat. 1208 (1980) (the "MPPA"). *See Maui Prince Hotel,* 918 P.2d at 1154. The MPPA created a statutory cause of action by adding Section 515[22] to ERISA. *See id.* The court commented the congressional intent behind enacting Section 515 was "'to promote the prompt payment of contributions and assist plans in recovering the costs incurred in connection with delinquencies.'" *Id.* at 1154–55 (quoting Staff of Sen. Comm. on Labor and Human Resources, 96th Cong., 2d Sess. S. 1076, The Multiemployer Pension Plan Amendments of 1980: Summary and Analysis of Consideration (Comm. Print 1980) at 43–44).

The *Maui Prince Hotel* court concluded:

[I]t is within the state's sovereign powers to determine that laborers enjoy superior creditor priority than that of other creditors who may have a financial interest in the assets of an owner who has made improvements on his or her property. Furthermore, a state has a right and obligation to protect the interests of its citizens within its borders. Therefore, by allowing ERISA beneficiaries to collect delinquent funds, Hawaii is protecting those whom it is obligated to serve. As noted in *Metropolitan Life Ins.,* . . .

"States traditionally have had great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Slaughter–House Cases,* [83 U.S.] 36, 62[21 L.Ed. 394] (1873)(quoting *Thorpe v. Rutland & Burlington R. Co.,* 27 Vt. 140, 149 (1855)). "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State."

918 P.2d at 1157 (quoting *Metropolitan Life Ins.,* 471 U.S. at 756, 105 S.Ct. 2380). The court held the Hawaii Lien Law did not conflict with ERISA.[23] *See id.*

■■■ *Ragan* was decided after *Bricklayers* and after the Supreme Court decision in *Travelers* which provided further clarifica-

---

**22.** Section 515 states:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

*Id.*

**23.** Other circuits reviewing state laws similar to the Construction Lien Law have found these laws do provide a supplemental enforcement method to those provided by Congress and have held such laws to be preempted. *See E.W. Howell,* 126 F.3d at 69 (concluding a state statute requiring a general contractor to assume responsibility for the subcontractor-employer's benefit obligations preempted); *Iron Workers,* 891 F.2d at 553.

Additional support for the position that the Construction Lien Law is preempted by ERISA might have also been found in *Marjo,* 988 F.2d 865 (9th Cir.1992) (enforcement method allowing a suit to collect contributions from subcontractors held preempted because supplements remedies set forth under ERISA), and *Carpenters Health and Welfare Trust Fund for Cal. v. Tri Capital Corp.,* 25 F.3d 849 (9th Cir.1994) (third party beneficiary statute and lien statute permitting suit to collect from construction lenders preempted because supplemented remedies provided by ERISA).

The Ninth Circuit in *Operating Eng'rs Health and Welfare Trust Fund v. JWJ Contracting Co.,* 135 F.3d 671 (1998), however, indicated these cases no longer support such a result. At issue in *JWJ Contracting* was a state law requiring public-work project employers obtain payment bonds through sureties. *See id.* at 679. The court distinguished the statutes involved in *Marjo* and *Tri Capital* as providing remedies against

tion of the breadth of ERISA preemption. Although the *Bricklayers* decision appears to suggest the Construction Lien Law does provide an alternative enforcement remedy, the *Ragan* decision instructs that the Construction Lien Law, a law of general applicability which does not conflict with either Section 502 or Section 515, is not preempted by ERISA. *See Ragan,* 62 F.3d at 512–13. The Construction Lien Law does not fall "within the scope of" the civil enforcement mechanism of ERISA, which "Congress intended ... to be the exclusive remedy for rights guaranteed under ERISA." *Ingersoll–Rand,* 498 U.S. at 144, 111 S.Ct. 478. Accordingly, the Defendants' Motion for Summary Judgment is granted. Conversely, the Bellemead Motion for Summary Judgment is denied.[24] Also, because the Construction Lien Law is not preempted by ERISA and no other independent basis for Federal jurisdiction exists, the instant matter is dismissed.[25] *See Greenblatt,* 68 F.3d at 576 n. 4.

*Conclusion*

For the reasons stated, the Defendants' Motion for Summary Judgment is granted

and the Bellemead Motion for Summary Judgment is denied. No independent basis for Federal jurisdiction exists over the claims asserted by the Defendants to enforce construction liens against Bellemead and Violet. The instant action is accordingly dismissed.

---

parties who never directly assented to contributing to ERISA benefit plans when the employer failed to make contributions. *See id.* The court observed:

> By making additional parties liable to plan employees, the[ ] state statutes [at issue in *Marjo* and *Tri Capital*] expand[ed] remedies by offering additional substantive mechanisms beyond what was contemplated by ERISA to solve the problem for which ERISA was created. In contrast, as JWJ's surety, Continental's contractual agreement to issue payment bonds transfers the obligation from the employer to its underwriter, for the protection of employees, and does not expand the remedies provided or contemplated by ERISA. This contractual relationship merely substitutes obligors.

The court continued:

> *Perhaps more importantly, however, this court decided both Marjo and Tri Capital before Travelers. If the breadth of [F]ederal pre[ ]emption described in Marjo and Tri Capital were still good law, Continental would probably prevail. However, these cases rely on expansive language from the Supreme Court demonstrating an understanding of ERISA pre[ ]emption that has since been tailored to better fit Congress's policy intentions.*

*JWJ Contracting,* 135 F.3d at 679 (emphasis added)

**24.** In determining the scope of ERISA preemption, traditional principles of federalism must be considered. *See Hook v. Morrison Milling Co.,* 38 F.3d 776, 781 (5th Cir.1994) (citing *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. 2890); *see also Cypress Fairbanks Medical Center Inc. v. Pan-American Life Ins. Co.,* 110 F.3d 280, 283 (5th Cir.), —— U.S. ——, 118 S.Ct. 167, 139 L.Ed.2d 110 (1997). "[Courts] must be guided by respect for the separate spheres of governmental authority preserved in [the] federalist system." *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 522, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981). Moreover, principles of federalism counsel that " '[i]f a[s]tate creates no prospect of conflict with a[F]ederal statute, there is no warrant for disabling it from attempting to address uniquely local social and economic problems.' " *Keystone,* 37 F.3d at 963 (quoting *Fort Halifax Packing,* 482 U.S. at 19, 107 S.Ct. 2211). These principles are fundamental to this opinion.

**25.** Bellemead is not a signatory to the collective bargaining agreement. *See* Counterclaim and Third Party Complaint at ¶ 47. Any award of attorneys' fees would be pursuant to the collective bargaining agreement. Accordingly, an award of attorneys' fees is inappropriate in the instant matter.